**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DONALD R. SHEPHERD,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **E\*TRADE SECURITIES LLC,** *et al.*, <br><br> **Defendants.** | **CIVIL ACTION NO.  25-1865** |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                                    **January 5, 2026**

Plaintiffs Donald R. Shepherd and Ethel Shepherd opened five accounts with Defendant E\*TRADE Securities LLC ("E\*Trade"), which is now operated by Defendants Morgan Stanley and Morgan Smith Barney LLC (collectively "MSSB"). Plaintiffs filed suit alleging that Defendants delayed or refused to effect transfers of the accounts to different institutions. By Court order, the accounts have since been transferred,[1] and the remaining claims concern claimed losses from the restrictions on the accounts before transfer and the delay in transferring them. Defendants have moved to compel arbitration of the dispute, which Plaintiffs oppose. The Court held oral argument on the Motion to Compel Arbitration and Stay the Action on July 22, 2025.[2]

---

[1] *See* Stipulation and Order [Doc. No. 12].

[2] *See* Hr'g Tr. [Doc. No. 22].

## I.    BACKGROUND

### A.    Plaintiffs' Five Accounts

Plaintiffs held a total of five accounts with Defendants.[3] In or about November 1998, Plaintiffs opened an account in both of their names (the "Joint Account").[4] In or about January 2005, Mr. Shepherd opened an account for the Ethel M. Shepherd Lifetime Trust (the "Trust Account").[5] In or about March 2010, Mr. Shepherd opened an IRA account in his name ("Mr. Shepherd's IRA Account").[6] On the same day, Mrs. Shepherd opened an IRA account in her name ("Mrs. Shepherd's IRA Account").[7] In or about December 2023, Plaintiffs jointly opened an account on behalf of the Shepherd Family Charitable Foundation (the "Shepherd Family Charitable Foundation Account").[8]

Defendants allege that Plaintiffs completed online account applications as to all five accounts.[9] To submit the online Account Applications, Plaintiffs clicked buttons indicating their acceptance of a notice that read: "I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY THE PREDISPUTE ARBITRATION CLAUSE IN SECTION 12 OF THE E*TRADE CUSTOMER AGREEMENT."[10] The E*Trade Customer Agreement ("Customer Agreement")

---

[3] Compl. ¶ 19 [Doc. No. 1-2].

[4] Defs.' Mot. Compel at 1 [Doc. No. 7-1].

[5] Defs.' Mot. Compel at 2 [Doc. No. 7-1].

[6] Defs.' Mot. Compel at 2 [Doc. No. 7-1].

[7] Defs.' Mot. Compel at 2 [Doc. No. 7-1].

[8] Defs.' Mot. Compel at 2 [Doc. No. 7-1].

[9] Defs.' Mot. Compel at 1-2 [Doc. No. 7-1]. Plaintiffs argue they did not file an online application to open the Shepherd Family Charitable Foundation Account, and instead state that they filled out a paper application only.

[10] Defs.' Mot. Compel at 2 [Doc. No. 7-1]; *see.* Defs.' Mot. Compel, Ex. B at 3 [Doc. No. 7-6]; Defs.' Mot. Compel, Ex. C at 3 [Doc. No. 7-7]; Defs.' Mot. Compel, Ex. D at 3 [Doc. No. 7-8]; Defs.' Mot. Compel, Ex. E at 3 [Doc. No. 7-9].

was hyperlinked, in blue font, to this notice.[11] Although Defendants presented evidence

establishing that Plaintiffs indicated acceptance by clicking a button online for the Trust

Account,[12] Mr. Shepherd's IRA Account,[13] Mrs. Shepherd's IRA Account,[14] and the Shepherd

Family Charitable Foundation Account,[15] Defendants have not established that Plaintiffs saw this

notice as to the Joint Account they opened more than 25 years ago, in November 1998.[16]

      Plaintiffs allege that they opened the most recent account, the Shepherd Family

Charitable Foundation Account, through a paper application.[17] This paper application featured

notice of an arbitration provision above the signature line where Plaintiffs signed on three

separate pages.[18] The notice read: "I ACKNOWLEDGE THAT I HAVE RECEIVED AND

READ A COPY OF THE E*TRADE FROM MORGAN STANLEY CLIENT AGREEMENT

FOR SELF-DIRECTED ACCOUNTS, WHICH CONTAINS A PRE-DISPUTE ARBITRATION

AGREEMENT AT SECTION 12."[19] The application included the web address (marked in blue)

where the agreement could be found online.[20] Plaintiffs state that a family friend submitted the

---

[11] *See* Defs.' Mot. Compel, Ex. B at 3 [Doc. No. 7-6]; Defs.' Mot. Compel, Ex. C at 3 [Doc. No. 7-7]; Defs.' Mot. Compel, Ex. D at 3 [Doc. No. 7-8]; Defs.' Mot. Compel, Ex. E at 3 [Doc. No. 7-9].

[12] *See generally* Defs.' Mot. Compel, Ex. B [Doc. No. 7-6].

[13] *See generally* Defs.' Mot. Compel, Ex. C [Doc. No. 7-7].

[14] *See generally* Defs.' Mot. Compel, Ex. D [Doc. No. 7-8].

[15] *See generally* Defs.' Mot. Compel, Ex. E [Doc. No. 7-9].

[16] *See generally* Defs.' Mot. Compel, Ex. A [Doc. No. 7-5] (not including a button to click indicating acceptance of the terms of the agreement or notice to the arbitration clause).

[17] Pls.' Opp'n Mot. Compel at 1-2 [Doc. No. 14-2]; *see* Pls.' Opp'n Mot. Compel, Ex. B [Doc. No. 14-4].

[18] *See* Pls.' Opp'n Mot. Compel, Ex. B [Doc. No. 14-4].

[19] Pls.' Opp'n Mot. Compel, Ex. B at ECF No. 9 [Doc. No. 14-4].

[20] Pls.' Opp'n Mot. Compel, Ex. B at ECF No. 9 [Doc. No. 14-4] ("The E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts is available online at etrade.com/msclientagree or by calling 800-387-2331.").

paper application on Plaintiffs' behalf, and Defendants provide evidence of electronic submission of the Shepherd Family Charitable Foundation Account Application.[21]

### B.    Defendants' Acquisition and the Post-Acquisition Transfer Process

In October 2020, E*Trade was acquired by MSSB.[22] Upon acquisition, a process began to combine and incorporate the services of these entities.[23] In September 2023, MSSB prepared to transfer all client accounts, including the four accounts Plaintiffs then held with Defendants.[24]

As part of the transfer process, Plaintiffs were mailed a pamphlet[25] that provided information regarding the transfer process.[26] The pamphlet informed Plaintiffs that their four pre-acquisition accounts would be governed by an amended customer agreement, called the E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts ("Amended Agreement").[27] The pamphlet notified Plaintiffs that "[t]here is nothing you need to do for this Transfer to take effect."[28] However, the pamphlet detailed an opt-out process if Plaintiffs did not wish to transfer E*Trade accounts to MSSB.[29] To reject the transfer, an account holder needed to call a number to signal an intention to opt-out and close or move the existing accounts to another broker-dealer.[30] The Amended Agreement was referenced in a section of the pamphlet titled "Your Client Agreement and Other Disclosures," stating: "The Self-Directed Account

---

[21] Hr'g Tr. at 28-30 [Doc. No. 22]; Defs.' Mot. Compel, Ex. E, Shepherd Family Charitable Foundation Customer Agreement [Doc. No. 7-9].

[22] Pls.' Opp'n Mot. Compel at 2 [Doc. No. 14-2].

[23] Pls.' Opp'n Mot. Compel at 3 [Doc. No. 14-2].

[24] Pls.' Opp'n Mot. Compel at 3 [Doc. No. 14-2].

[25] *See* Pls.' Opp'n Mot. Compel, Ex. A [Doc. No. 14-3].

[26] Pls.' Opp'n Mot. Compel, Ex. B at 3 [Doc. No. 14-4].

[27] Pls.' Opp'n Mot. Compel at 3-4 [Doc. No. 14-2].

[28] *See* Pls.' Opp'n Mot. Compel, Ex. A at 3 [Doc. No. 14-3].

[29] Pls.' Opp'n Mot. Compel, Ex. A at 15 [Doc. No. 14-3].

[30] Pls.' Opp'n Mot. Compel, Ex. A at 15 [Doc. No. 14-3].

Agreements are available on etrade.com and at *etrade.com/mssb*."[31] The Amended Agreement contained an arbitration provision similar, if not identical, to the provision contained in the original Customer Agreements for the accounts.[32] The arbitration clause in the Amended Agreement states, among other things, that by signing the arbitration agreement, "[a]ll parties to this Customer Agreement are giving up the right to sue each other in court, including the right to trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed."[33]

Defendants have moved to compel arbitration, arguing that Plaintiffs agreed to arbitration through valid "clickwrap" contracts, as they notified Plaintiffs of the arbitration provisions and claim they required Plaintiffs to acknowledge and assent to the terms by clicking an "Accepted" button.[34]

Plaintiffs claim that the operable agreement at issue as to all five accounts is the Amended Agreement, which replaced the pre-existing Customer Agreement following Defendant E*Trade's acquisition, and regardless, that none of the arbitration agreements in any of the Customer Agreements are valid and enforceable.[35] They argue that the arbitration provision contained in the Amended Agreement is invalid because Plaintiffs did not assent to the term and that the agreement is unconscionable because it constitutes a contract of adhesion and unreasonably favors Defendants.[36]

---

[31] *See* Pls.' Opp'n Mot. Compel, Ex. A at 27 [Doc. No. 14-3].

[32] *See* Pls.' Opp'n Mot. Compel, Ex. C at 45-47 [Doc. No. 14-5].

[33] Pls.' Opp'n Mot. Compel, Ex. C at 45 [Doc. No. 14-5].

[34] Defs.' Mot. Compel at 8 [Doc. No. 7-1].

[35] Pls.' Opp'n Mot. Compel at 1, 3 [Doc. No. 14-2].

[36] Pls.' Opp'n Mot. Compel at 11-12 [Doc. No. 14-2]. Plaintiffs argued that the New York choice-of-law clause in the agreement is unenforceable because New York "bears no substantial relationship to the parties or the contract," and the application of New York law "would be contrary to the public policy of Pennsylvania." Pls.' Opp'n Mot. Compel at 8 [Doc. No. 14]. Accordingly, Plaintiffs argue that Pennsylvania law should apply to the interpretation of the arbitration provision. Pls.' Opp'n Mot. Compel at 8 [Doc. No. 14-2].

## II.    LEGAL STANDARD

This is a diversity case requiring the Court to evaluate the enforceability of an arbitration agreement. There are two plausible standards of review for a motion to compel. On the first standard, when it is clear from the face of a complaint and supporting documents that an arbitration clause applies to the claims, then a Rule 12(b)(6) motion to dismiss standard applies.[37] On the second standard, when the complaint and supporting documents are unclear about an agreement to arbitrate, the Court allows limited discovery and applies a summary judgment standard.[38]

Here, Plaintiffs did not include the contracts or any arbitration agreements in the Complaint or its exhibits. The text of the contracts and the arbitration clauses therein were made available to the Court only in relation Defendants' motion to compel arbitration. But for Defendants' motion to compel arbitration, the Court would not have been furnished with copies of the contracts or otherwise been put on notice of the existence of arbitration agreements.[39]

Because it is not "apparent, based on the 'face of [the] complaint, and documents relied upon in the complaint,' that [Plaintiffs'] claims 'are subject to an enforceable arbitration clause,'" the Court applies a summary judgment standard.[40]

---

[37] *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

[38] *Id*. at 776.

[39] *Cf. Silfee v. Automatic Data Processing*, 696 F. App'x 576, 578 (3d Cir. 2017) (holding that the district court erred in applying the summary judgment standard where "a party move[d] to compel arbitration based on an authentic arbitration agreement *that [was] attached to the complaint"* (emphasis added)). The fact that the arbitration agreement was not attached to or referenced in the Complaint is a sufficient reason to apply the summary judgment standard. *See Roman v. Prince Telecom LLC*, No. 22-1348 to 49, 2023 WL 3194464, at *3 (3d Cir. May 2, 2023) ("The District Court correctly concluded that the present motion to compel arbitration should be decided under the summary judgment standard because none of the complaint's factual allegations allude to an arbitration agreement, nor does the complaint rely on an arbitration agreement to state a claim.' " (quotation marks and citation omitted)).

[40] *Guidotti*, 716 F.3d at 776 (quoting *Somerset Consulting*, 832 F. Supp. 2d at 482).

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[41] A disputed fact is "'material' if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law."[42] A dispute as to a material fact is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[43] In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[44]

## III. DISCUSSION

### A. Choice of Law

As a preliminary matter, the Court must address which state's law applies to the claims and arbitration agreements. Because this Court's jurisdiction is based on diversity, the conflict-of-laws rules of the forum state, Pennsylvania, apply.[45]

Under Pennsylvania law, "courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."[46] Pennsylvania courts have adopted section 187 of the Restatement (Second) Conflict of Laws, which honors choice-of-law provisions "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the

---

[41] Fed. R. Civ. P. 56(a).

[42] *Pricharda v. Checkr, Inc.*, No. 22-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[43] *Id.* (citing *Anderson*, 477 U.S. at 248).

[44] *Guidotti*, 716 F.3d at 772 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[45] *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

[46] *Kruzits v. Okuma Mach. Tool*, 40 F.3d 52, 55 (3d Cir. 1994).

law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue."[47] "Pennsylvania courts will uphold choice-of-law provisions in contracts to the extent that the transaction bears a reasonable relation to the chosen forum."[48]

In this case, three of the Customer Agreements—Mr. Shepherd's IRA Account, Mrs. Shepherd's IRA Account, and the Shepherd Family Charitable Foundation Account Agreements—contain a choice of law provision stating that New York law applies,[49] and the other two Customer Agreements—the Joint Account and the Trust Account Agreements—contain a choice of law provision stating that California law applies.[50] Defendants argue that the Amended Agreement amended the choice of law provision to select New York law as to all Customer Agreements.[51]

Plaintiffs claim that applying New York law to the arbitration agreements would be contrary to the public policy of Pennsylvania because such an application would "eliminat[e] the avenues for vindication of statutory protections afforded residents in their various respective states."[52] However, Plaintiffs have not established how an inability to proceed under those alternative state statutes is contrary to a "fundamental policy of a state which has a material greater interest than the chosen state in the determination of the particular issue."[53]

---

[47] *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (quoting *Kruzits*, 40 F.3d at 55).

[48] *Id*. at 390 (*quoting Churchill Corp. v. Third Century Inc*., 578 A.2d 532, 537 (Pa. Super. Ct. 1990)).

[49] Defs.' Mot. Compel at 7 [Doc. No. 7-1]; Ex. C, Mr. Shepherd's IRA Account Agreement, at 47 [Doc. No. 7-7]; Ex. D, Mrs. Shepherd's IRA Account Agreement at 47 [Doc. No. 7-8]; Ex. E, Shepherd Family Charitable Foundation Account Agreement at 55 [Doc. No. 7-9].

[50] Defs.' Mot. Compel at 7 [Doc. No. 7-1]; Ex. A, Joint Account Agreement at 10 [Doc. No. 7-5]; Ex. B, Trust Account Agreement at 30 [Doc. No. 7-6].

[51] Hr'g Tr. at 16-17 [Doc. No. 22].

[52] Pls.' Opp'n Mot. Compel at 10 [Doc. No. 14-2].

[53] *Gay*, 511 F.3d at 389.

Because Defendants' principal places of business are in New York,[54] there is a reasonable basis for the parties' choice of New York law, and the choice of law provisions will be honored. New York law applies to Mr. Shepherd's IRA Account, Mrs. Shepherd's IRA Account, and the Shepherd Family Charitable Foundation Account Agreements.

Defendants also presented evidence that there is a reasonable basis for the parties' choice of California law for the Joint Account and Trust Agreements. At the time the accounts were created, Defendant E*Trade had a principal place of business in California, and the company was founded in California.[55] Because Defendant E*Trade's principal place of business was in California, there is a reasonable basis for the choice of law provision and California law applies to the Joint Account and Trust Account Agreements.

Defendants argue that Mr. Shepherd's IRA Account, Mrs. Shepherd's IRA Account, the Joint Account, and the Trust Account Agreements were replaced by the Amended Agreement. Pennsylvania's choice of law analysis applies to conflicts of substantive law.[56] Amendment or modification of a contract is an issue of substantive, not procedural, law, so Pennsylvania's choice of law doctrine that honors contracting parties' intent and enforces contracted choice of law provisions applies.[57] The Court will honor the parties' choice of law provisions as originally contracted to determine whether the Amended Agreement is valid. Accordingly, an analysis under New York law will decide the validity of the Amended Agreement as to Mr. Shepherd's IRA Account and Mrs. Shepherd's IRA Account Agreements, and an analysis under California

---

[54] Defs.' Notice Removal ¶¶ 13-25 [Doc. No. 1].

[55] Hr'g Tr. at 16-17 [Doc. No. 22].

[56] *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. Ct. 2005).

[57] *Id*. (quoting *Ferraro v. McCarthy-Pascuzzo*, 777 A.2d 1128, 1137 (Pa. Super. Ct. 2001) ("Substantive law is the portion of the law which creates rights and duties of the parties to a judicial proceeding, whereas procedural law is the set of rules which proscribe the steps by which the parties may have their respective rights and duties judicially enforced.").

law will determine the validity of the Amended Agreement as to the Joint Account and Trust

Account Agreements.

    1.    <u>Validity of the Amended Agreement Under New York Law – IRA Accounts</u>

Under New York law, a contract requires offer, acceptance, and "a manifestation of

mutual assent."[58] A contract may be modified, but "[f]undamental to the establishment of a

contract modification is proof of each element requisite to the formulation of a contract,

including mutual assent to its terms."[59] Modifications of written contracts may be proved

circumstantially, including by conduct of the parties.[60]

Here, the Amended Agreement included an offer when Defendants sent Plaintiffs a

pamphlet describing the changes and noting that a new agreement would replace the Customer

Agreements. The offer described the nature of acceptance, which would be manifested by doing

nothing and not taking steps to opt out. While silence may not always constitute acceptance,[61] a

party is bound by an agreement "if its actions, gauged by an objective standard, support the

conclusion that it accepted the agreement."[62] Mutual assent was manifested by Plaintiffs not

opting out and both parties continuing to operate according to the Amended Agreement. In fact,

Plaintiffs opened a new account with Defendants after the Amended Agreement was in place,

which manifests assent to the modified contract terms as to all Agreements.

---

[58] *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).

[59] *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980).

[60] *Id.*; *Lawrence M. Kamhi, M.D., P.C. v. East Coast Pain Mgmt., P.C.*, 112 N.Y.S.3d 189, 191 (N.Y. App. Div. 2019).

[61] *Diarassouba v. Urban*, 892 N.Y.S.2d 410, 415 (N.Y. App. Div. 2009) ("[A] silence which breeds ambiguity cannot constitute acceptance.").

[62] *H&H Acquisition Corp. v. Financial Intranet Holdings*, 669 F. Supp. 351, 359 (S.D.N.Y. 2009) (quoting *Mgmt. Recruiters of Boulder v. Nat'l Econ. Research Assocs., Inc.*, No. 02-3507, 2006 WL 2109478, at *4 (S.D.N.Y. July 24, 2006)).

Plaintiffs nonetheless argue that the Amended Agreement is an invalid contract of adhesion. "A contract of adhesion contains terms that are unfair and nonnegotiable and arises from a disparity of bargaining power or oppressive tactics."[63] A form agreement, like the Amended Agreement, is not automatically a contract of adhesion because "[s]uch claims are judged by whether the party seeking to enforce the contract has used high pressure tactics or deceptive language in the contract and whether there is inequality of bargaining power between the parties."[64]

Plaintiffs have not established that Defendants used high pressure tactics nor deceptive language in implementing the Amended Agreement. That the contract was offered to Plaintiffs on a take-it-or-leave-it basis does not establish that the Amended Agreement was a contract of adhesion. The pamphlet notifying Plaintiffs of the Amended Agreement provided typed-out website links, not just hyperlinks on printed paper, directing Plaintiffs to the Amended Agreement. Further, the choice of law clause in the Amended Agreement is not substantively unconscionable. Particularly as applied to the IRA Accounts, the choice of law provision instituted no change from the original Customer Agreements.

Under New York law, the Amended Agreement is valid as applied to the choice of law provision, and New York law applies in evaluating the validity of the arbitration clauses in Mr. Shepherd's IRA Account and Mrs. Shepherd's IRA Account Agreements.

---

[63] *Love'M Sheltering, Inc. v. Cnty. of Suffolk*, 824 N.Y.S.2d 98, 99 (N.Y. App. Div. 2006).

[64] *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643, 647 (N.Y. 1989).

2.    <u>Validity of the Amended Agreement Under California Law – Joint and Trust Accounts</u>

Under California law, "[a] modification of a contract is a change in the obligations of a party by a subsequent mutual agreement of the parties."[65] A written contract may be modified by a written contract.[66]

Under California law, a contract of adhesion is "a standardized contract, which imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."[67] That a contract is one of adhesion does not automatically make the contract unconscionable.[68] Rather, unconscionability is a defense to enforcement of a contract of adhesion.[69] "The central issue is whether the adhesive contract is unduly oppressive or unconscionable."[70] A contract or provision which is not within the reasonable expectations of the adhering party is also unenforceable.[71]

Here, the Amended Agreement's choice of law provision cannot be said to be outside of the reasonable expectations of the Plaintiffs. Since agreeing to the Joint Account and Trust Account Agreements and prior to the Amended Agreement, Plaintiffs entered into two additional Customer Agreements which designated New York as applicable law. While the original Trust Account and Joint Account Agreements designated California law, it was not outside of reasonable expectations of Plaintiffs for the Amended Agreement to include the New York

---

[65] *West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 299 (Cal. Ct. App. 2019).

[66] *Id.*; Cal. Civ. Code § 1698.

[67] *Neal v. State Farm Ins. Co.*, 10 Cal. Rptr. 781, 784 (Cal. Ct. App. 1961).

[68] *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 172 (Cal. 1981); *California Grocers Assn. v. Bank of America*, 27 Cal. Rptr. 2d 396, 401-02 (Cal. Ct. App. 1994).

[69] *Graham*, 623 P.2d at 612-13.

[70] *California Grocers Assn.*, 27 Cal. Rptr. at 401.

[71] *Graham*, 623 P.2d at 612.

choice of law provision after Plaintiffs' continued use of E*Trade's services and contracting with E*Trade.[72]

A contract is substantively unconscionable if it is "overly harsh, unduly oppressive, so one-sided as to 'shock the conscience', or unfairly one-sided."[73] Unconscionability is not just a bad deal, but a contract "with terms that are unreasonably favorable to the more powerful party."[74]

Plaintiffs have not established that a choice of law clause electing New York law is substantively unconscionable. Their claim that the selection of New York law strips Plaintiffs of statutory protections under Pennsylvania law does not establish unconscionability, particularly as California law previously applied to the Joint Account and Trust Account Agreements.

Accordingly, under California law, the Joint Account and Trust Account Agreements were validly amended by the Amended Agreement, and the Amended Agreement's choice of New York law is valid. New York law will apply to evaluating the arbitration clauses in the Joint Account and Trust Account Agreements.

Because the Shepherd Family Charitable Account was established after MSSB's acquisition of E*Trade, that Customer Agreement was not modified by the Amended Agreement. However, the Customer Agreement applicable to the Shepherd Family Charitable Account is identical to the Amended Agreement applicable to the remaining four accounts. It also selects New York in its choice of law clause and New York law applies to determining the validity of its arbitration clause.

---

[72] *See id.* (holding that a contractual provision was not contrary to reasonable expectations of plaintiff when he had been party to many other contracts with other parties belonging to a common association).

[73] *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741., 748 (Cal. 2015) (internal citations and quotations omitted).

[74] *Id.* (quoting 8 Williston on Contracts (4th ed. 2010) § 18.10, p. 91).

B.      Arbitration Provisions

Section 2 of the Federal Arbitration Act (FAA) provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[75] Through its enactment of the FAA, Congress "expressed a strong federal policy in favor of resolving disputes through arbitration."[76] Arbitration, however, "is strictly a matter of contract."[77]

To determine whether a party may be compelled to arbitrate, a court must decide whether "a valid agreement to arbitrate exists" and whether "the particular dispute falls within the scope of the agreement."[78] The FAA "instructs courts to refer to principles of applicable state law when determining the existence and scope of an agreement to arbitrate."[79]

Here, only the first issue is in dispute. If the agreements to arbitrate are valid, then the dispute clearly falls within the scope of the agreement. The parties dispute whether the arbitration agreements are valid, and as discussed, this Court will apply New York state law in determining the validity of arbitration agreements as applied to all five Accounts. This Court also must give "due regard . . . to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."[80] Therefore, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."[81]

---

[75] 9 U.S.C. § 2.

[76] *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009)).

[77] *Id.* at 220 (quoting *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)).

[78] *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

[79] *Id.* (citing *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989)).

[80] *Volt Info.*, 489 U.S. at 475-76.

[81] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Under New York law, a contract requires offer, acceptance, and "a manifestation of mutual assent."[82] New York law permits a "clickwrap" agreement where a party clicks a button to indicate agreement but does not necessarily view the full contact's terms, and binds parties to the contract, so long as the signatory is given a "sufficient opportunity to read the . . . agreement, as assents thereto after being provided with an unambiguous method of accepting or declining the offer."[83]

When "an offeree does not have actual notice of certain contract terms, he is nonetheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent."[84] New York law directs courts to look to whether the term was obvious and whether it was called to the offeree's attention in determining whether an offeree is on inquiry notice.[85] To determine whether an offeree has inquiry notice of contract terms, New York law assesses whether the term was called to the offeree's attention in a "clear and conspicuous way."[86] These principles also apply to web-based contracts.[87]

### 1.    The Trust Account, Mr. Shepherd's IRA Account, and Mrs. Shepherd's IRA Account

The original Trust Account, Mr. Shepherd's IRA Account, and Mrs. Shepherd's IRA Account Agreements included arbitration agreements, which stated:

---

[82] *Starke*, 913 F.3d at 288-89 (2d Cir. 2019) (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999).

[83] *Scotti v. Tough Mudder Inc.*, 97 N.Y.S.3d 825, 832 (N.Y. Sup. Ct. 2019) (quoting *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 164 (E.D.N.Y. 2012)).

[84] *Starke*, 913 F.3d at 289 (citing *Schnabel*, 697 F.3d at 118 (emphasis in original)).

[85] *Id*.

[86] *Id.* (citing *Gildor v. USPS*, 179 F. App'x 756, 759-60 (2d Cir. 2006); *Arthur Philip Export Corp. v. Leathertone, Inc.*, 87 N.Y.S.2d 665, 667 (N.Y. App. Div. 1949)).

[87] *Id*. (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31; *Resorb Networks, Inc. v. YouNow.com*, 30 N.Y.S.3d 506, 511 (N.Y. Sup. Ct. 2016)).

> I agree to resolve by binding arbitration any controversy that may arise between [E*TRADE] and me relating in any way to my relationship with [E*TRADE], any Account held with [E*TRADE], or any service provided by [E*TRADE] to me. This arbitration agreement includes any controversy involving transactions of any kind made on my behalf by or through [E*TRADE], or the performance, construction or breach of this [customer agreement] or any other written agreement between [E*TRADE] and me. . . . I make this arbitration agreement on behalf of myself and my heirs, administrators, representatives, executors, successors, assigns and together with all other persons claiming a legal or beneficial interest in my Account. . . . This arbitration provision will be enforced and interpreted exclusively in accordance with applicable federal laws of the United States, including the Federal Arbitration Act.[88]

Defendants claim that in submitting Account Applications to establish these accounts, Plaintiffs clicked buttons indicating their acceptance.[89] In accepting terms to submit the Account Application, Plaintiffs clicked a button marked "CONTINUE," indicating acknowledgement that:

> I am of legal age to contract. I acknowledge that I have received, read, and agree to be bound by the terms and conditions as currently set forth in the E*TRADE Securities Customer Agreement as amended from time to time . . . I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY THE PREDISPUTE ARBITRATION CLAUSE IN SECTION 12 OF THE E*TRADE CUSTOMER AGREEMENT.[90]

Part of the terms agreed to by clicking "CONTINUE" include a statement certifying that certain information in the application form is accurate under penalty of perjury. The terms are listed under a heading titled "Account Agreement."

In this original agreement, the arbitration term was called to Plaintiffs' attention in a clear and conspicuous way. The sentence about the Arbitration Clause is in capital letters, is set off in a shorter paragraph, is under a heading titled "Account Agreement,"

---

[88] Defs.' Mot. Compel, Ex. B § 8 [Doc. No 7-6], Ex. C. § 8 [Doc. No. 7-7], Ex. D § 8 [Doc. No. 7-8].

[89] Defs.' Mot. Compel at 2 [Doc. No. 7-1].

[90] Defs.' Mot. Compel, Ex. B at 2 [Doc. No 7-6], Ex. C. at 2 [Doc. No. 7-7], Ex. D at 2 [Doc. No. 7-8].

and includes a hyperlink to the Customer Agreement.[91] While the term does not explicitly state that the arbitration is binding, it clearly draws attention to the existence of an arbitration term, which Plaintiffs could have read in its entirety.[92] Defendants did not need to detail the full arbitration agreement on the application in order to place Plaintiffs on inquiry notice of the arbitration agreement.[93]

Plaintiffs claim the arbitration agreement in the Amended Agreement, which replaced the original agreements, is invalid.

First the Plaintiffs argue the arbitration agreement in the Amended Agreement lacks meaningful mutual assent. As discussed above, the Amended Agreement was a valid modification to the contract under New York law. Plaintiffs continued operating according to the Amended Agreement and opened a new account with Defendants after the Amended Agreement was implemented. Plaintiffs also manifested assent to the Amended Agreement by the terms of the pamphlet, which directed Plaintiffs to take no action if they assented to the Amended Agreement.

Second, Plaintiffs argue the arbitration agreement in the Amended Agreement is procedurally and substantively unconscionable. A contract is unconscionable under New York law when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time as to be unenforceable according to its literal terms."[94]

---

[91] Defs.' Mot. Compel, Ex. B at 2 [Doc. No 7-6], Ex. C. at 2 [Doc. No. 7-7], Ex. D at 2 [Doc. No. 7-8].

[92] *Cf. Starke*, 913 F.3d at 292.

[93] *Id*.

[94] *Gillman v. Chase Manhattan Bank, N.A.* 73 N.Y.2d 1, 10 (N.Y. 1988) (quotation marks omitted).

Generally, there must be a showing of both procedural and substantive unconscionability.[95]

As discussed above, the Amended Agreement was not a contract of adhesion under New York law, nor was it procedurally unconscionable just because it was offered on a take-it-or-leave-it basis. "It is beyond dispute that, under New York law, 'arbitration agreements are enforceable despite an inequality in bargaining power.' "[96] Yet, "[w]hile inequality in bargaining power . . . is not alone sufficient to hold arbitration agreements unenforceable, such inequality, when coupled with high pressure tactics that coerce acceptance of onerous terms, may be sufficient to show that [the signatory] lacked a meaningful choice."[97] Plaintiffs have not shown that Defendants used high pressure tactics, coercion, or deception in procuring their agreement to the Amended Agreement. They do not allege they were provided insufficient time to read the Amended Agreement, that they were not permitted to review the Agreement with an attorney, or that they were otherwise "coerced or pressured into signing the Agreement without reading it or that the Agreement was induced by fraud or entered into under duress."[98] Plaintiffs contend that the pamphlet did not attach the entire terms of the Amended Agreement and that it provided hyperlinks printed on physical paper, and thus they did not have an opportunity to properly assent to the Agreement. However, the pamphlet not only provided a

---

[95] *Id.*

[96] *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 572 (S.D.N.Y. 2009) (quoting *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 481 (N.Y. App. Div. 2004)) (alteration omitted).

[97] *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citation omitted).

[98] *Ciago v. Ameriquest Mortg. Co.* 295 F. Supp. 2sd 324, 329 (S.D.N.Y. 2003); *see also Gillman*, 73 N.Y.2d at 11 ("The focus [of procedural unconscionability] is on such matters as . . . whether deceptive or high-pressure tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power.").

hyperlink but typed-out web addresses for the Amended Agreement and Plaintiffs had sufficient time to identify and review the Amended Agreement.

The arbitration term is not substantively unconscionable. The term equally binds both Plaintiffs and Defendants to arbitration. Plaintiffs' claims that arbitration removes their right to Pennsylvania statutory protections fail. Even if Plaintiffs litigated their case in court, New York law would still apply. The assignment of a case to arbitration does not impact the applicable law. Plaintiffs argue the arbitration clause is unconscionable because it calls to apply the Financial Industry Regulatory Authority ("FINRA") rules for arbitration, and Defendants are members of FINRA.[99] Plaintiffs are unable to cite any case law supporting the proposition that arbitration with FINRA rules with members of FINRA is unconscionable. Thus, they are essentially arguing that all arbitration involving FINRA members is unconscionable. This argument fails.

Further, the arbitration clause in the Amended Agreement is the same as in the original Customer Agreements. It is not substantively unconscionable for the Amended Contract to retain a term from the original agreements, of which Plaintiffs had adequate inquiry notice. This Court is not persuaded that Plaintiffs have established substantive unconscionability. There is no genuine issue of material fact as to the enforceability and validity of the arbitration agreements in the Trust Account, Mr. Shepherd's IRA Account, and Mrs. Shepherd's IRA Account Agreements.

2.     The Shepherd Family Charitable Foundation Account

After E*Trade was acquired by MSSB and the Amended Agreement took effect, Plaintiffs opened the Shepherd Family Charitable Foundation Account. Plaintiffs claim they

---

[99] Pls.' Resp. Opp'n Mot. Compel at 16-17 [Doc. No. 14-2].

completed the application to open this account on paper and did not submit an online application.[100] The paper application included a bolded notification that the Account's Customer Agreement contained an arbitration provision.[101] The full Customer Agreement was not appended to the paper application. Filling out that paper application did not require clicking an accept or continue button to acknowledge its terms.

However, after Plaintiffs filled out the paper application, a family friend—who was listed on the account as the responsible person—submitted the paper application to E*Trade on behalf of Plaintiffs, with their consent and approval.[102] Defendants presented evidence that an online application was submitted for the Shepherd Family Charitable Foundation Account, which included clicking a button acknowledging the terms of the application, and Plaintiffs did not present testimony or any evidence from the family friend to rebut that evidence.[103] The evidence before the Court establishes that Plaintiffs, or a representative of the Plaintiffs, completed both a paper and online application to open the Shepherd Family Charitable Foundation Account.

The paper application provided prominent bolded notice directly above the signature line that states "I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE. I ACKNOWLEDGE THAT I HAVE RECEIVED AND READ A COPY OF THE E*TRADE FROM MORGAN STANLEY CLIENT AGREEMENT FOR SELF-DIRECTED ACCOUNTS WHICH CONTAINS A PRE-DISPUTE ARBITRATION

---

[100] Pls.' Resp. Opp'n Mot. Compel at 6 [Doc. No. 14-2].

[101] Pls.' Resp. Opp'n Mot. Compel at 6 [Doc. No. 14-2]; Ex. B, Shepherd Family Charitable Trust Account Paper Application at ECF Nos. 8, 9, 12 [Doc. No. 14-4].

[102] Hr'g Tr. at 28-30 [Doc. No. 22].

[103] Defs.' Mot. Compel, Ex. E, Shepherd Family Charitable Foundation Customer Agreement [Doc. No. 7-9].

AGREEMENT AT SECTION 12."[104] This term provides a reasonably prudent offeree inquiry notice of the arbitration term. While the exact term of the arbitration agreement is not included in the notice, the notice does direct the offeree to the appropriate section and agreement containing the arbitration agreement and provides a web address for the full client agreement.

Additionally, in completing the online application, Plaintiffs, or someone on their behalf, clicked a button acknowledging notice of the account agreement, which included a hyperlink to the Customer Agreement and noted the section of the agreement containing the arbitration clause. This hyperlink is sufficient to provide assent to the clickwrap agreement given the provided inquiry notice of the arbitration term.[105]

There is no genuine issue of material fact regarding the validity and enforceability of the arbitration agreement in the Shepherd Family Charitable Foundation Account Agreement.

   3.  <u>The Joint Account</u>

For the Joint Account, which Plaintiffs opened in 1998, Defendants did not provide evidence of any online "clickwrap" agreement or other acknowledgment specifically providing inquiry notice of the arbitration agreement contained in the Joint Account Agreement.[106] The Customer Agreement itself does include arbitration provisions, specified in the table of contents of the Customer Agreement and bolded, which states that arbitration is final and binding, discloses discovery limitations and potential arbitrator's connections with the securities industry, and states "You agree to arbitrate any controversy between you and E*Trade . . . arising out or relating in any way to your Account."[107]

---

[104] Pls.' Resp. Opp'n Mot. Compel, Ex. B, Shepherd Family Charitable Trust Account Paper Application at ECF No. 8 [Doc. No. 14-4].

[105] *Starke*, 913 F.3d at 291-92.

[106] Defs.' Mot. Compel, Ex. A, Joint Account Agreement at 2-3 [Doc. No. 7-5].

[107] Defs.' Mot. Compel, Ex. A, Joint Account Agreement at 9 [Doc. No. 7-5].

While there is not sufficient evidence to show that Plaintiffs were on inquiry notice of the arbitration agreement at the time of opening the Joint Account, the later Customer Agreements included arbitration provisions that state "I agree to resolve by binding arbitration any controversy that may arise between E*TRADE Securities or its affiliates and me relating in any way to my relationship with E*TRADE Securities, any Account held with E*TRADE Securities, or any service provided by E*TRADE Securities to me."[108] The later Customer Agreements listed in their first sentence in the arbitration section that all accounts with E*Trade were governed by binding arbitration.

New York law requires mutual assent to the terms of an agreement, which can be evidenced by a party's conduct that a reasonable person would understand to constitute assent.[109] Here, Plaintiffs proceeded to open four additional accounts with Defendants for which they did have inquiry notice of an arbitration agreement. Plaintiffs did not challenge the Joint Account Customer Agreement once they received inquiry notice of the arbitration agreements in their following accounts. Plaintiffs continued to use and open new accounts with Defendants for over twenty years, which manifests their assent and continued assent to the contract terms.

Further, the Amended Agreement validly modified the Joint Account Agreement. As discussed, the Amended Agreement was not procedurally or substantively unconscionable. The Amended Agreement does not become substantively unconscionable as it modifies the Joint Account Agreement. There were no inappropriate bargaining tactics or pressure applied to Plaintiffs to induce them to agree to the Amended Agreement. The arbitration term, of which

---

[108] Defs.' Mot. Compel, Ex. B § 8 [Doc. No 7-6], Ex. C. § 8 [Doc. No. 7-7], Ex. D § 8 [Doc. No. 7-8].

[109] *Scotti.,* 97 N.Y.S.3d at 833 (citing *Schnabel*, 697 F.3d at 118 (emphasis in original)).

Plaintiffs had been on inquiry notice for the Trust Account, Mr. Shepherd's IRA Account, and Mrs. Shepherd's IRA Account Agreements, was not altered by the Amended Agreement.

Because this Court must generously construe parties' intentions as it relates to issues of arbitrability,[110] it finds that given Plaintiffs' inquiry notice of the arbitration agreements in the later four Customer Agreements, the broad language of the arbitration agreements applying them to all E*Trade Accounts, and Plaintiffs' continued use of all five accounts according to the Customer Agreements since 1998, there is no genuine issue of material fact as to the validity and enforceability of the arbitration agreement in the Joint Account Agreement.

## IV.    CONCLUSION

Because the Court finds that the arbitration agreements are valid and enforceable as applied to all five account agreements—the Joint Account, the Trust Account, Mr. Shepherd's IRA Account, Mrs. Shepherd's IRA Account, and the Shepherd Family Charitable Foundation Account Agreements, Defendants' Motion to Compel Arbitration and Stay the Action will be granted. An order will be entered.

---

[110] *Mitsubishi Motors Corp.*, 473 U.S. at 626.